

```
                FILED
          U.S. DISTRICT COURT
         EASTERN DISTRICT OF LA

         2005 DEC 20  AM 7: 47

         LORETTA G. WHYTE
                  CLERK
```

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KEVIN OLIVER                                    CIVIL ACTION

VERSUS                                          NUMBER: 04-2767

LYNN COOPER, WARDEN                             SECTION: "K"(5)

### REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(A), presently before the court is the application for writ of habeas corpus of petitioner, Kevin Oliver, and the State's response thereto. (rec. docs. 1, 7). Having determined that an evidentiary hearing is not necessary, it is recommended, for the reasons that follow, that the instant petition be dismissed with prejudice.

I.  PROCEDURAL HISTORY

Petitioner Oliver is a state prisoner currently incarcerated at the Avoyelles Correctional Center. On January 23, 2002, Oliver, following trial by jury, was found guilty of committing a crime against nature in violation of LSA-R.S. 14:89(2). On June 4, 2002, Oliver was sentenced to five years incarceration with credit for time served, but immediately thereafter, the State filed a multiple bill against him. Following an October 18, 2002 hearing, Oliver

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No _____

was adjudicated to be a multiple offender, his original five-year sentence was vacated and he was re-sentenced to 20 years incarceration with credit for time served. However, on February 7, 2003, pursuant to defense counsel's motion to reconsider, Oliver's sentence was reduced to ten years with credit for time served.[1]

Oliver appealed both his conviction and sentence. On May 21, 2003, the Louisiana Fourth Circuit Court of Appeal affirmed his conviction and sentence. State v. Oliver, No. 2002-KA-2280, 846 So.2d 1001(La. App. 4 Cir. 2003) (unpublished opinion).[2] On July 2, 2004, the Louisiana Supreme Court denied Oliver's writ application. State ex rel. Oliver v. State, 877 So.2d 138 (La. 2004). Thereafter, Oliver did not seek state post-conviction relief.

In the instant federal habeas corpus petition, Oliver challenges the constitutionality of his trial based upon the alleged inappropriateness of the prosecutor's closing argument. Oliver complains that the prosecutor, during his closing remarks to the jury, improperly referred to Oliver's prior convictions.

---

[1] In his habeas petition, Oliver represents that the length of his sentence is 20 years. However, the court's staff confirmed, via a telephone conference with the records department of Avoyelles Correctional Center, where Oliver is presently incarcerated, that Oliver, in fact, is serving a ten-year sentence.

[2] Copies of the Louisiana Fourth Circuit's unpublished opinion are contained in both volumes 1 and 2 of the State record.

Further, the prosecutor unnecessarily described Oliver's alleged criminal action in a crude manner, thereby inflaming the jury and misquoting the statute, LSA-R.S. 14:89, which Oliver was charged with violating.  Oliver also challenges the constitutionality of his adjudication as a multiple offender, claiming it was based upon improperly admitted expert testimony.  In its response (rec. doc. #7), the state concedes that Oliver has exhausted state court remedies as required by 28 U.S.C. §2254(b)(1)(A) and that his petition is timely under 28 U.S.C. §2244(d).

## II.  FACTS[3]

On the night of June 27, 2001, New Orleans Police Detective Marcellus White, performing an undercover assignment for the New Orleans Police Department Vice Squad, was wearing civilian clothing and driving an unmarked police vehicle through the French Quarter when he noticed Oliver standing at the intersection of St. Louis and Dauphine Streets.  The two made eye contact, and Oliver motioned for White to turn around and stop, which White did.  Oliver then opened the passenger door and sat in the front seat.  Thereafter, White commenced driving again.

During their drive, Oliver allegedly informed White that he was from Trinidad and was in town for the Essence Festival.  Oliver then

---

[3]The facts are taken from the trial testimony along with the Louisiana Fourth Circuit's unpublished opinion, State v. Oliver, No. 2002-KA-2280, 846 So.2d 1001 (La. App. 4 Cir. 2003).

asked White if he could give him a little cash to "tide him over".[4] The amount of $20 was agreed upon, in exchange for which Oliver offered to provide White with "anything in particular" that White might like, suggesting that some people enjoyed "to beat each other, suck each other or basically look at a sexy body."[5] White explained at trial that based upon his experience working with the vice squad, he interpreted the above to mean that Oliver, in exchange for $20, would masturbate, perform fellatio, or allow White to view his body.

In response to the above offer, White advised Oliver "to pick one", and Oliver stated that he would perform fellatio in exchange for the $20.[6] At that point, pursuant to White's signal, Detective Chin Nguyen, a member of the New Orleans Police Department Vice Squad, stopped White's vehicle and arrested Oliver.

In contrast to the above testimony, Oliver testified that White approached him, asking for directions, and that he got into White's car in order to direct him to the House of Blues. Oliver further denied that there was any discussion between himself and White regarding the performance of sexual acts for money. Oliver, however, admitted, that he had four prior convictions.

---

[4] See State rec., vol. 1 of 2, trial transcript at p.12, line 8.

[5] See State rec., vol. 1 of 2, trial transcript at p.12, lines 13-14, 16-17.

[6] See State rec., vol. 1 of 2, trial transcript at p.12, lines 25-29.

4

Specifically, he admitted that he was convicted three times, twice in 1990 and once in 1994, for burglary, and once, in 1988, for forgery.[7]

### III. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a comprehensive overhaul of federal habeas corpus legislation, including 28 U.S.C. §2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law where there has been an adjudication on the merits in State court proceedings.

State court determinations of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. §2254(d)(1) and receive deference unless they were "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000). The United States Supreme Court has advised that:

> Under the "contrary to" clause, a federal habeas corpus court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing

---

[7] See State rec., vol. 1 of 2, trial transcript at p.52, lines 18-31.

> legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 1056, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); Hill, 210 F.3d at 485. Questions of fact found by the state court are "presumed to be correct ... and we will give deference to the state court's decision unless it `was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Hill, 210 F.3d at 485, quoting 28 U.S.C.§2254(d)(2).

## IV. ANALYSIS

### A. Prosecutorial Misconduct

Oliver complains that his constitutional rights were violated by virtue of the inappropriateness of the prosecution's closing argument. Specifically, as set forth by the Louisiana Fourth Circuit Court of Appeal, Oliver complains about the following closing remarks:

> Well, the bottom line is this is a hustle. You get into somebody's car and say, "Give me some money. Give me some money for an act." Okay?
> Now, Mr. Oliver has several prior convictions for breaking into people's houses. What happens when people break into people's houses. They find stuff. They sell it for money.
> He's got a conviction for forgery. Again, cheating people out of some money. The crime here, ladies and gentlemen, is when you enter somebody's car and you say, "I will suck you off or let you beat me off. I will suck

you off for twenty dollars." That is a crime. Okay?[8] According to Oliver, his constitutional rights were violated by virtue of the prosecution's reference to his prior convictions for burglary and forgery, along with the "vulgar means of expression" employed by the prosecution to describe his illegal action. In fact, by virtue of this language, Oliver accuses the prosecution of "misquot[ing]" the applicable statute, LSA-R.S. 14:89, since the statute describes a "[c]rime against nature" as "[t]he unnatural carnal copulation by a human being with another", rather than, as described by the prosecution, the "suck[ing]... off" of one human being by another.

The Supreme Court has recognized that improper argument or conduct on the part of the prosecution, "may 'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.'" Greer v. Miller, 483 U.S. 756, 765, 107 S.Ct. 3102, 3109, 97 L.Ed.2d 618 (1987), quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). However, as explained by the Fifth Circuit, to establish a due process violation by virtue of a prosecutor's alleged inflammatory remarks, a petitioner "must demonstrate that the misconduct [was] persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper

---

[8] See State rec., vol. 1 of 2, trial transcript at p.57, lines 14-29. See also State v. Oliver, No. 2002-KA-2280, 846 So.2d 1001 (unpublished opinion).

7

remarks." Jones v. Butler, 864 F.2d 348, 356 (5th Cir. 1988), cert. denied, 490 U.S. 1075, 109 S.Ct. 2090, 104 L.Ed.2d 653 (1989).

Addressing Oliver's claim on the merits, the Louisiana Fourth Circuit Court of Appeal determined that "[n]one of the objectionable remarks prejudiced the defense so as to deprive [Oliver] of a fair trial."[9] The state appellate court reasoned:

> [T]he defendant testified, and confirmed his convictions for burglary and forgery. Because the defendant's prior convictions were properly before the jury, the prosecutor's reference to them in closing remarks was merely cumulative. Given the defendant's admission, and the evidence of his guilt, there is no indication that the jury was inflamed by the prosecutor's remarks or that the remarks played a part in the defendant's conviction.

Oliver, No. 2002-KA-2280, 846 So.2d 1001.

Evidence of Oliver's guilt was primarily presented to the jury in the form of Detective White's eyewitness testimony. White testified that Oliver entered his car and, after a short time had

---

[9]Initially, the Louisiana Fourth Circuit noted that defense counsel, rather than raising a contemporaneous objection, "voiced his objection to the prosecutor's remarks via motion for mistrial after the jury began deliberating." Oliver, No. 2002-KA-2280, 846 So.2d 1001. The court then observed that "[a] defendant cannot avail himself of an alleged error unless he made a contemporaneous objection at the time of the error, stating the specific ground of the objection, and he is limited on appeal to that ground articulated at trial." Id. (citations omitted). However, the court then went on to address the merits, stating that "even if an objection had been made, and the issue preserved for appellate review, there was no error." Id. Because the Fourth Circuit addressed the merits rather than relying on Louisiana's "contemporary objection rule", embodied in La.C.Cr.Proc. art. 841, there is no corresponding procedural bar preventing federal habeas review on the merits. See generally Coleman v. Thompson, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

passed, offered to "suck [him] off" for $20.[10] Thus, the prosecutor's alleged "vulgar means of expression" in describing Oliver's crime during closing arguments was not language that the jury had not already heard. By using such language, the prosecution was merely reiterating the testimony of its primary witness, rather than attempting to inflame jurors. There was no need to incense jurors given the strength of the state's case. The cross-examination of White reflects that there was little reason for the jury to doubt the veracity of his testimony that Oliver entered his car and offered to perform fellatio in exchange for $20. Further, the lack of corroboration, in the form of a tape or video recording, did not hinder White's credibility as a result of the logical explanation he provided for the lack of such evidence. Specifically, White explained:

> [I]f [suspects] know that they're being audioed or they're being videoed they tend to get violent, and we never really know what, per se, the defendant has on them at that particular time. So they could have anywhere from a knife, to a switchblade, to a gun, or whatever, and we really don't want to take that chance. So for officer safety we limit the communication that we have with each other....[11]

In contrast, the credibility of Oliver's testimony, the only evidence presented which was contradictory to White's version of

---

[10] See State rec., vol. 1 of 2, trial transcript at p.12, lines 26-29.

[11] See State rec., vol. 1 of 2, trial transcript at p.21, lines 5-13.

events, was undermined by virtue of the state's cross-examination. For instance, Oliver's explanation as to how he came to be a passenger in White's car was not particularly believable.

> Q. Okay. And as far as getting in the car, had you ever met Marcellus White before?
>
> A. No.
>
> Q. Okay. Do you typically, when you give people directions, get in the car with them?
>
> A. Sure.
>
> Q. Okay.
>
> A. I walk in the good graces of God. Why not?[12]

Based upon the above, it is clear that the state court's denial of Oliver's prosecutorial misconduct claim does not represent an unreasonable application of Supreme Court law to the facts of this case. The allegedly offensive remarks during the prosecution's closing argument clearly did not render Oliver's trial unfair and constitute a denial of his constitutional right to due process.

### B. Improperly Admitted Expert Testimony

The standard for the admissibility of expert testimony was established by the United States Supreme Court in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), wherein the Court established a two-prong test for determining the admissibility of expert testimony. First, it must

---

[12] <u>See</u> State rec., vol. 1 of 2, trial transcript at p.51, lines 19-26.

"be based on scientific knowledge" and second, it must "assist the trier of fact in understanding or determining a fact in issue." Wright v. Dretke, 2004 WL 438941, *31 (N.D. Tex. 2004), citing Daubert, 509 U.S. at 592, 113 S.Ct. at 2795.

Oliver claims that the trial court erred at his multiple bill hearing in accepting New Orleans Police Officer Isidro Magana as a fingerprint expert without adequately establishing his credentials by conducting a "Daubert hearing". A review of the transcript from Oliver's October 18, 2002 multiple bill hearing reflects that the prosecution sought to have defendant stipulate that Officer Magana was "an expert in the taking, examination, comparison, and analyzation of fingerprints".[13] Defense counsel, however, refused, and the following testimony regarding Magana's credentials ensued.

> BY MS. RISH [FOR THE PROSECUTION]
>
> Q. Officer Magana, does your job require you to take and to analyze fingerprints?
>
> A. Yes, it does.
>
> Q. How often do you take fingerprints and analyze fingerprints in your day-to-day job duties?
>
> A. On a daily basis.
>
> Q. Okay. Can you give an approximate amount of times in a week? Would you be able to - -
>
> A. I do it for about eight hours a day, identifying, classifying, and taking fingerprints whenever they come to the Criminal Record Room.

---

[13] See State rec., vol. 1 of 2, multiple bill transcript at p.3, lines 4-7.

Q. Okay. Thank you. What educational training have you had regarding the identification of fingerprints?

A. I have been to the basic school of fingerprints at LSU. I've been to the advanced school in LSU of fingerprinting.

Q. Okay.

A. And I was trained by one of the veteran officers with the New Orleans Police Department, Loosemore.

Q. Have you been qualified in any other court and in criminal court?

A. I have been qualified in almost every court, including this one....

Q. How long have you been identifying and taking fingerprints?

A. Going on two years.[14]

Following the above testimony, the trial court called for "[c]ross-examination", directing defense counsel to "travers[e] [Magana] on the predicate for expertise qualification."[15]

BY MR. SAUVIAC FOR THE DEFENSE:

Q. So have you ever been trained by the FBI regarding fingerprints?

A. By the FBI, no. I have attended one of their conferences.

Q. Were you tested at that conference?

A. I'm sorry.

---

[14] See State rec., vol. 1 of 2, multiple bill hearing transcript at p. 3, lines 18-32 and p.4, lines 1-12.

[15] See State rec., vol. 1 of 2, multiple bill hearing transcript at p. 4, lines 23-24.

12

Q. Were you tested at that conference?

A. No.

Q. Okay. Have you ever been tested by any federal agency?

A. Not by any federal agency.

Q. As far as the testimony that you intend to give in connection with this case, has anybody checked your conclusions to see if they agree or they disagree with your conclusions in this particular case?

A. If you're referring to anybody has verified, no.

Q. Okay. And specifically when you do things in the laboratory there's checks and balances where someone checks your findings if you should - - and for example, a print comes in that's lifted off of a vehicle. You would do it and you would get a supervisor or a fellow fingerprint examiner to confirm or to check your work. Is that the procedure that occurs?

A. Whenever we have a case - - when we handle a whole case and identify somebody, we also have another examiner verify my work, then it's verified by the supervisor.

Q. Okay. So actually there's two other people who check and double-check your work when it's done in the laboratory regarding your fingerprint studies?

A. When we handle the entire case, yes.

Q. That has not happened in this case regarding what you're about to try to testify to; is that right?

A. If you're referring specifically to multiple billing, no.

Q. No. Specifically this case as it affects this man's life and the testimony that you're about to give. Nobody has checked or double-checked your work and the information that you're about to testify to; is that right?

A. Today?

13

Q.   Today.

A.   That's correct.

Q.   All right.  And who are the other people who would check and double-check your work at your office if you were there?

A.   Other latent print examiners.

Q.   Let me ask you this additionally:  You make - - the information that you're attempting to testify from here today, the State said that you are a custodian and your clarification is you are one of the custodians; is that right?

A.   That is correct.

Q.   Okay.  And as far as the custodians of what?

A.   Of criminal records.

Q.   Criminal records?  All right.  As far as the requisites for that as far as when a person's record is created, like the booking procedures?  Are you familiar with that?

A.   That is incorrect.

Q.   I'm sorry.

A.   That's incorrect, what you said.

Q.   Okay.  You would not be a custodian of those records is what you're saying?

A.   We are custodians when the record comes to New Orleans Police Department, not when it's at Central Lockup.

Q.   Exactly.  So at Central Lockup where the records are prepared, where the fingerprints are taken, and the documents are generated, you have no custodial relationship there; is that correct?

A.   That's incorrect.

Q.   It can't be both ways.

14

A.  Let me give you an example.  For example, if somebody gets arrested ....

Q.  Right.

A.  - - I am one of the officers who physically walks to Central Lockup and I hand-deliver the original copy of the fingerprints to the Criminal Record Room.

Q.  You actually go get them and bring them back to the Record Room?

A.  Yes, sir.

Q.  So whatever happens ... when these prints are generated or created, you have no role whatsoever in that?

A.  When it's created, no.  We are not present.

Q.  Okay.  And as far as what goes on in the process of creating them, you have no role in that?

A.  That's correct.

Q.  You don't even show up until ... the next day or the following day to merely pick up paperwork and bring it back over to your office to hold the paperwork?

A.  That's - - yeah.

* * *

Q.  So you - -

A.  In the specific situation you're referring to when somebody gets arrested - -

Q.  Right.

A.  - - we do not physically fingerprint the person at Central Lockup.  We do not work for the Sheriff's Department.

Q.  Okay.  So that was my question.  So your answer instead of incorrect should be, "Mr. Sauviac, that's correct."

15

A.  No.  It's not.  You told me - -[16]

At that point, pursuant to the prosecution's objection, the trial court stopped defense counsel's questioning and the following colloquy took place:

THE COURT:

   I'm going to stop this here.  This is for qualification - -

MR. SAUVIAC:

   And I am.  I'm trying to - -

THE COURT:

   - - as to his expertise, not chain of custody.  I'm not interested in chain of custody right now.  This is strictly a tendering on the predicate of whether Officer Magana can give expert testimony to the taking and the analysis of latent fingerprints.  Confine it to that.

MR. SAUVIAC:

   And we also, Judge - - okay.  We also would raise the Daubert and the [Kumno] Tire issue as well to be considered in his qualifications or abilities to be qualified as a fingerprint examiner.

THE COURT:

   All right.  The Court's not going to go into a Daubert hearing for purposes of this.

MR. SAUVIAC:

   That's the extent of our questioning, and note our objection for the record.

---

[16] See State rec., vol. 1 of 2, multiple bill hearing transcript at p.4, lines 27-32, pp.5-7, p.8, lines 1-7.

16

```
THE COURT:

     All right.  At this time the Court is going to
qualify Officer Magana as an expert in the field of the
analysis and identification of fingerprints, latent
fingerprint analysis, and as such is qualified to give his
expert opinion in that field.[17]
```

The Louisiana Fourth Circuit, in addressing the instant claim, first reiterated Oliver's contention that the trial court "cut short his cross-examination of Magana and that he should have been allowed to conduct a Daubert hearing". Oliver, No. 2002-KA-2280, 846 So.2d 1001. The court then responded to this contention by noting that the trial court, in fact, "directed defense counsel to question Magana on his qualifications as an expert".[18] Thus, "defense counsel in fact had the opportunity he now complains of being denied." Id.

Next, the state appellate court noted generally "that fingerprints are an acceptable means of identification in habitual offender hearings" and that "[p]ast experience and training have been held to qualify a witness as an expert in fingerprint analysis." Id. (citations omitted). Based upon these general principles and the fact that "Magana's testimony showed familiarity and knowledge of the comparison of different fingerprints to determine whether they were made by the same person", the Fourth

---

[17] See State rec., vol. 1 of 2, multiple bill hearing transcript at p.8, lines 17-32, p.9, lines 1-16.

[18] See supra at p.13 for quotation of trial court's directive to defense counsel to question Magana with respect to his qualifications.

Circuit concluded that Oliver had failed to meet his burden of showing that Magana was not qualified to testify as an expert under Daubert. Id.

As the above transcript excerpt reflects,[19] Magana, at the time he offered the expert testimony at issue, had been analyzing fingerprints on a daily basis for approximately two years, had received training from a veteran police officer and had taken both the basic and advanced fingerprint courses offered by Louisiana State University ("LSU"). Further, Oliver's multiple bill hearing did not represent the first occasion upon which Magana had been called upon to offer expert fingerprint analysis. Magana testified that he had "been qualified in almost every court", including Section "H" of Orleans Parish Criminal District Court, the section to which Oliver's case was assigned. Based upon the above credentials, coupled with the fact that fingerprint testimony has been presented in cases and accepted as valid scientific evidence for many years, see United States v. Havvard, 260 F.3d 597 (7th Cir. 2001) and United States v. Joseph, 2001 WL 515213 (E.D. La. 2001), this court finds that the Fourth Circuit's rejection of Oliver's claim does not represent an unreasonable application of Daubert to the facts of this case.

Accordingly;

---

[19] See supra at pp.12-13.

## RECOMMENDATION

It is hereby recommended that the application for federal habeas corpus relief of Kevin Oliver be dismissed with prejudice.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this _16_ day of _Dec_, 2005.

_____
UNITED STATES MAGISTRATE JUDGE